**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| TODD R. KUCHERA,<br><br>    Petitioner,<br><br>v.<br><br>SAMUEL J. PLUMERI, JR., et al.,<br><br>    Respondents. | Civil Action No. 25-85 (KMW)<br><br>**OPINION** |

**WILLIAMS**, District Judge:

This matter comes before the Court on Petitioner Todd R. Kuchera's petition for a writ of habeas corpus. (ECF No. 1.) Following an order to answer, the state filed a response to the petition (ECF No. 6), to which Petitioner replied. (ECF No. 9.) Also before the Court is the state's motion to seal portions of the state court record. (ECF No. 8.) In light of the fact that the record was sealed in state court, the obvious privacy interests of the minor victim in this case, and the nature of the facts of this case, and in light of Petitioner's non-opposition to the motion to seal, this Court finds that there is good reason to seal the relevant portions of the state court record, and the state's motion shall be granted. For the following reasons, Petitioner's habeas petition is denied, and Petitioner shall be denied a certificate of appealability.

I.      **BACKGROUND**

In the opinion affirming Petitioner's conviction and sentence, the Superior Court of New Jersey Appellate Division summarized the factual background of this matter as follows:

When [Petitioner] was nineteen, he sexually assaulted his seven-year-old sister. As a result of a conviction arising from that conduct, [he] served a sentence [at a state facility for sex offenders and] was required to register as a sex offender pursuant to Megan's Law.

In 2015, when [Petitioner] was forty-four, he failed to comply with Megan's Law registration requirements. At the time, [Petitioner] was living with his girlfriend, M.B., and her daughter, R.B. In light of [Petitioner]'s failure to register Division of Child Protection and Permanency (DCPP) caseworker Daniel Transue was sent to the home to conduct a safety assessment of the child. Transue was given no information with respect to the details of [Petitioner]'s prior offense. He was accompanied by a police officer whose body camera recorded the events at the home.

At approximately 6:50 p.m., Transue sat at the dining room table with R.B. Her mother left the room, telling the child she would be nearby. [Petitioner] was outside on the porch. The officer's body camera recorded Transue's conversation with R.B. After a brief discussion about R.B.'s age, her pet, and fairy wings she was wearing, Transue asked R.B. if anyone ever hits or hurts her. R.B. stated that the brother of a child with whom she attends school hit her.

Transue then asked R.B. "does mommy and daddy ever hit or hurt each other. R.B. responded that her mother "don't like tickles." The following exchange ensued [in which Transue is identified as D.T.]:

> D.T.: Mommy don't like tickles?
>
> R.B.: Yeah, me yeah I don't like tickles.
>
> D.T.: Who tickles you?
>
> R.B.: [Petitioner].[1] I don't like tickles. Me I like tickles on the neck.
>
> D.T.: Where [does] [Petitioner] tickle you at?
>
> R.B.: Sometimes at . . . (inaudible)
>
> D.T.: he tickles you on the neck?
>
> R.B.: Yeah, sometimes.

---

[1] R.B. referred to Petitioner as "dad" or "daddy" during the interview.

2

D.T.: Does he tickle you? Where else does he tickle you?

R.B.: Here, right here, right here and I don't like it. And, and, and . . .

[While not visible on the camera recording, Transue testified that R.B. pointed "down low" and "to her private areas" during this exchange.]

D.T.: Where else does he tickle you at?

R.B.: My nose, my eyes . . . (inaudible).

D.T.: he tickles you on your eyes?

R.B.: Yeah, sometimes my . . .

D.T.: Does he ever tickle you any place else?

R.B.: In the back.

D.T.: In the back? Does he ever tickle you on the front by your privates?

R.B. Just my, just my nose.

D.T.: Just your nose, does he ever . . . Does he ever tickle you up here or where you go potty or anything like that?

R.B.: No.

D.T.: No.

R.B.: Just tickles my butt.

D.T.: Who tickles your butt?

R.B.: [Petitioner] and sometimes him bounce on him, takes his pants off then from him, butt in my butt then he (inaudible) softly.

D.T.: Wait, what does [he] do?

R.B. Takes his pants off.

D.T. He takes his pants off?

3

R.B.: Yeah and put butt in my butt.

D.T.: He put his butt in your butt?

R.B.: Mm-hmm.

D.T.: Oh, that's not good.

R.B.: Yeah.

D.T.: Where is mommy when this happens?

R.B.: Mm, well is sometimes home, sometimes home in the, bubble of the shower.

D.T.: Uh-huh.

R.B.: One time I didn't wash myself.

D.T.: It's how does [Petitioner] put his butt on your butt? Do you have clothes on when [he] does that?

R.B.: (Inaudible) and he takes his pants off for that.

D.T.: [Petitioner] asks you to take your pants off?

R.B.: Mm-hmm.

D.T.: Does a . . . what?

R.B.: (Giggling) He did this. [It is not clear from the record whether any motions accompanied this statement]

. . . .

D.T.: Mm, what a, does [Petitioner], do you ever see [Petitioner] without his clothes on?

R.B.: What?

D.T.: Do you ever see [Petitioner] without his clothes on?

R.B.: Mm, doesn't him saw anymore.

D.T.: Do you ever see him when he doesn't have any pants on or anything like that?

4

> R.B.: Well his clothes, my, him for him don' have any pants on last night, then I close my door and [Petitioner] change that means.
>
> D.T.: Mm-hmm. Let me ask you again you said that [Petitioner] tickles your butt, how is [it that he] tickle[s] your butt?
>
> R.B.: This.
>
> D.T.: Does he tickle your butt, do you have your clothes on or you have clothes off? You have your clothes off?
>
> R.B.: Mm-hmm.
>
> D.T.: Does [Petitioner] ever, what do you call where you go pee-pee, what do you call that?
>
> R.B.: I call that kuka, pee-pee.
>
> D.T.: And has [Petitioner] ever? Has [he] ever?
>
> R.B.: Tickle me out of his pee?
>
> D.T.: In your pee-pee.
>
> R.B.: Yeah.
>
> D.T.: [Petitioner] tickles you on your pee-pee?
>
> R.B.: Yeah and he just tickles me where I poo.

Transue's interview of the child lasted approximately eight minutes. Because of R.B.'s disclosures, Transue contacted the county prosecutor's office. At the direction of detective Lindsay Woodfield, Transue transported M.B., and with M.B.'s consent, R.B., to the prosecutor's office to permit Woodfield to interview the child.

During the interview, which began at about 8:45 p.m. and was video recorded, R.B. identified various body parts on anatomical drawings of a female and male persons. R.B. described both the female and male genitals as "kuka," the female and male breasts as "boobies" and the female and male buttocks as "butt." R.B.'s first disclosure was in the following exchange with Woodfield, identified as L.W.:

5

> L.W.: Has anybody ever touched you on your kuka or your boobies and you did not like it?
>
> R.B.: No one did.
>
> L.W.: No one did.
>
> R.B.: No, when I kiss my mom and hug her, but [Petitioner] just did something and I don't want, no.
>
> L.W.: What did he do?
>
> R.B.: He did, he take my pants off and his pants off and put his butt and his kuka in my butt and kuka. That's not really good.

R.B. told the detective that the incidents happened in her bedroom and her mother's bedroom. She stated that her pants were of at the time and that she could feel [Petitioner]'s kuka and butt and they were soft. R.B. stated that [Petitioner] told her that he "liked her kuka" and asked her to touch her kuka and his kuka. R.B. also said that when [Petitioner] changed her for bedtime, he put his kuka In her kuka and that she could feel it "in the body." When asked if anything came out of [Petitioner]'s kuka, R.B. said she could feel it was "wet" like water and that she thought he got his kuka wet in the shower. She said that her mother never did those things to her and that she never told anyone about the incidents because she believed they were secret.

R.B. also made the following disclosure during the interview:

> L.W.: Hey, I have a question. Did [Petitioner] ever touch any part of his body in front of you?
>
> R.B.: No, never. He just touch his kuka and my kuka. He (inaudible) like this, his, him kuka and my kuka stuck together, that means soft, and he rub my kuka and his kuka, then it stops.
>
> L.W.: Okay. So he rubs your kuka and his kuka?
>
> R.B.: Yeah, him, him kuka and my kuka are stuck together, I mean it's soft.

When asked how many times [Petitioner] put his kuka on hers, R.B. responded "ten." The detective asked R.B. to enact what she described [Petitioner] doing to her with anatomically correct dolls. R.B. pressed the genitals of the dolls together, asked the

detective to help remove the pants and underwear from the dolls, and then continued to press the doll's genitals together. She also placed the male doll's hands on the genitals of both dolls.

Woodfield also interviewed [Petitioner], who drove himself to the prosecutor's office, that evening. Prior to the interview, he waited in an unlocked room and was free to leave. Woodfield began the interview at about 9:26 p.m. by informing [Petitioner] that he was not under arrest. After offering him a drink, Woodfield read [Petitioner] his *Miranda* [*v. Arizona*, 384 U.S. 436 (1966),] warnings as a precaution.[] [Petitioner] executed a *Miranda* waiver rights form.[]

After obtaining [Petitioner]'s *Miranda* waiver, Woodfield informed him that R.B. had made allegations that he was "sexually assaulting her" and that she claimed he put his penis on her vagina. [Petitioner] initially denied the claims. He then attempted to minimize the sexual contact he had with R.B., claiming the child unexpectedly jumped on him while he was masturbating while unclothed and sat on his lap. Woodfield expressed doubt about the veracity of [Petitioner]'s admissions, suggesting he was telling half-truths.

Ultimately, [Petitioner] admitted that he allowed R.B., who was unclothed, to sit on his lap while he was unclothed and erect on two or three occasions. He admitted that his bare, erect penis went between R.B.'s unclothed legs and rubbed on her unclothed vagina, and that he has "always had a thing about skin on skin." He denied having penetrated the child. [Petitioner] also admitted that on another occasion he rubbed medicated lotion on R.B.'s vagina for several minutes longer than necessary and, while doing this, was sexually aroused by the age difference between him and the child and by R.B.'s vagina.

[The Appellate Division thereafter recounted a conversation between Woodfield and Petitioner relevant to a *Miranda* claim Petitioner raised on direct appeal but not directly relevant to the claims raised in this petition.]

At this point in the interview, [Petitioner] admitted that "once or twice" while he was masturbating in his bedroom a partially undressed R.B. ran in, jumped on the bed, pulled off a blanket covering [his] erect penis and sat on him. The detective told [Petitioner] that she did not believe his account of what transpired between him and the child. [Woodfield then spent several minutes attempting to convince Petitioner to tell the truth by discussing his relationship with M.B. and Woodfield's desire to help him.]

7

>[Petitioner] again claimed that any contact between his erect penis and the child's vagina was accidental. The detective told [him] that she did not believe his account and urged him to be truthful about his conduct with R.B. . . .
>
>. . . .
>
>[Petitioner] then mad ethe admissions described above. Woodfield arrested [Petitioner] after the interview, which lasted a little more than an hour.
>
>At DCPP's request, Dr. Gladibel Medina, a pediatrician with a specialty in child abuse pediatrics, interviewed R.B. about a month after her initial disclosures. During the interview, R.B. told Dr. Medina that [Petitioner] touched an area of her body no one is supposed to touch and that he was "not her favorite human." Using anatomically correct dolls, R.B. demonstrated that [Petitioner] vaginally penetrated her with his penis and touched her vagina with his hand. Because M.B. told the doctor that R.B. was traumatized by a physical examination after her disclosures, Dr. Medina did not conduct a physical examination of R.B. The doctor's interview of the child was not recorded.
>
>A grand jury subsequently indicted [Petitioner], charging him with: (1) first-degree aggravated sexual assault, . . . (2) second-degree sexual assault, . . . and (3) second-degree endangering the welfare of a child[.]
>
>Prior to trial, the State moved pursuant to N.J.R.E. 803(c)(27), the tender-years exception to hearsay, to admit R.B.'s statements to Transue, Woodfield, and Dr. Medina. [Petitioner] opposed the motion.
>
>[Petitioner] also moved for a hearing . . . to bar R.B.'s out-of-court statements to Transue and Woodfield, as well as R.B.'s in-court testimony. He argued that R.B. made her allegations in response to overly suggestive interview techniques which rendered them untrustworthy. In support of his . . . motion, [Petitioner] requested to introduce the expert testimony of Dr. Jemour Maddux, a licensed psychologist. An affidavit submitted by Dr. Maddux identified what he believed to be interview techniques used by Transue and Woodfield that undermined the trustworthiness of R.B.'s responses. He concluded, however, that he could not opine with respect to whether R.B.'s disclosures were accurate.
>
>The trial court held a hearing on the motions, at which Transue, Woodfield, and Dr. Medina testified. Before the court

issued its opinion, [Petitioner] moved to have Dr. Maddux testify as an expert in opposition to the [tender years hearsay] motion. He argued that this testimony would assist the court in deciding whether R.B.'s out-of-court statements were spontaneous and trustworthy.

The trial court subsequently issued an oral opinion on the motions. The court concluded that the expert testimony of Dr. Maddux was not necessary for it to decide the . . . motion. The court found that Dr. Maddux's report "discusses interviewing techniques generally, then categorizes the questions utilized by . . . Transue and . . . Woodfield. Nothing within the report touches on the factors related to trustworthiness that this [c]ourt must consider in reaching a[] . . . determination."

The court found that Transue's eight-minute interview of R.B. satisfied every factor of trustworthiness militating toward admission of the child's statements to him. The court noted that "[t]he spontaneity of R.B.'s disclosure cannot be disputed" and found that Transue's questions did not suggest answers. The court also observed that R.B. corrected Transue several times when he posed obviously incorrect suggestions to her, such as expressing doubt that she did not have a driver's license. In addition, the court found R.B. had no difficulty distinguishing between fantasy and reality, having explained to Transue that she could not fly with the fairy wings she was wearing. Finally, the court noted the absence of any suggestion in the record that R.B. had a motive to fabricate allegations against [Petitioner].

The court made similar findings with respect to R.B.'s statements to Woodfield. The court found that although Woodfield posed some long form questions, she did so when R.B. had gone off on a tangent. In addition, the court noted that none of the detective's questions suggested answers. The court found that R.B. was consistent in her descriptions of the abuse, used age-appropriate terminology, and spoke with Woodfield shortly after her initial disclosures with little time to fabricate accusations against [Petitioner]. Finally, the court found that there was "no question" that R.B.'s statements to Dr. Medina were trustworthy. The court, therefore, granted the State's [motion to admit R.B.'s statement under the tender-years exception to the hearsay rules.]

With respect to [Petitioner]'s . . . motion, the court found that [Petitioner] failed to meet his initial burden of showing some evidence that R.B.'s statements were the product of suggestive or coercive interview techniques. The court noted that it reviewed the video recordings of R.B.'s interviews and evaluated how the interviewers acted, heard the questions they posed, and watched

R.B.'s responses. The court, finding that Dr. Maddux's testimony was not necessary for it to make a determination with respect to [Petitioner]'s initial showing, concluded that the interviews of R.B. suffered from none of the inappropriate techniques present in [guiding state caselaw on the issue].  It, therefore, denied [Petitioner]'s motion for a taint hearing.

[The trial court also denied a *Miranda* motion regarding Petitioner's statements to Woodfield, as Petitioner drove himself to the interview, was not in custody at the time of the questioning, was not handcuffed or arrested, retained his car keys throughout, and the court concluded no reasonable person would have felt they were in custody under the circumstances. The trial court further found that Petitioner validly waived his *Miranda* rights in any event, and that Petitioner had failed to show that his will was overborne by Woodfield's questioning techniques.]

[Petitioner] subsequently moved to have Dr. Maddux testify as an expert at trial. The court denied the motion, concluding that the question of R.B.'s credibility is not beyond the ken of the jurors, negating the need for expert testimony, and that the proposed testimony had the potential to be confusing, given the court's decisions with respect to the admissibility of R.B.'s disclosures. The court noted that [Petitioner] could, during cross-examination, highlight the interview techniques used by Transue, Woodfield, and Dr. Medina. In addition, the court found that Dr. Maddux's expert report was inadmissible because the opinions expressed in his affidavit was inconclusive and unreliable. The court noted that while Dr. Maddux stated that he observed several interview techniques used with R.B. that might render her disclosures unreliable, he could not determine whether those techniques actually had an effect on the reliability of her answers. Moreover, the court found, Dr. Maddux did not express his opinion with a reasonable degree of scientific of psychological certainty.

At trial, the principle evidence was the four out-of-court statements presented at the hearings: (1) the bodycam video recording of Transue's interview of R.B.; (2) the video recording of Woodfield's interview of R.B.; (3) the video recording of [Petitioner]'s interrogation by Woodfield; and (4) Dr. Medina's testimony recounting her interview of R.B. In addition, R.B., then nine years old, testified. She referred to [Petitioner] by spelling out his first name each time she mentioned him. She testified that she did not remember and did not want to talk about what [Petitioner] did to her. She testified, however, that the thing she did not want to talk about happened "a lot" and made her feel "uncomfortable," "sad," and "angry."

> [Petitioner requested during a charge conference a charge suggesting that interviews of young children could be overly coercive, but the court declined in light of its ruling that the interviews of R.B. were not unduly suggestive or coercive under guiding state precedent.]
>
> The jury deadlocked on the first-degree aggravated sexual assault, and convicted [Petitioner] of t he other two charges. The court sentenced [Petitioner] to a nine-year term of incarceration, with an eighty-five percent period of parole ineligibility, for second-degree sexual assault and a concurrent nine-year term of imprisonment for second-degree endangering the welfare of a child. [The state did not pursue a retrial of the hung first-degree count.]

(ECF No. 7-13 at 1-29.)

Petitioner appealed, raising a claim that his statement had been taken in violation of *Miranda* and that his will had been overborn by the questioning of Woodfield, a claim asserting that the trial court erred in precluding his expert from testifying during pre-trial hearings and at trial, and a claim challenging the denial of his requested suggestibility instruction. (*Id.* at 30.) The Appellate Division rejected the *Miranda* claim, finding the questioning was not so unduly coercive to overbear Petitioner's will, and that the interrogation had otherwise comported with the requirements of *Miranda* and its progeny. (*Id.* at 31-38.) The Appellate Division likewise rejected Petitioner's jury instruction claim as the jury was provided a standard instruction on witness credibility, and the instruction Petitioner requested was not required or warranted under state law and was instead likely only to cause confusion. (*Id.* at 46-48.)

Finally, the Appellate Division rejected Petitioner's claim that the trial court erred in declining to permit Dr. Maddux to testify. (*Id.* at 38-46.) In so doing, the Appellate Division found that R.B.'s statements were clearly admissible under the tender-years hearsay exception, that the trial court had appropriately determined that there was no evidence of unduly suggestive interviewing techniques or an absence of trustworthiness as to R.B.'s statements, and that the trial

11

court had appropriately explained why it did not find Dr. Maddux's proposed testimony helpful in making its determinations. (*Id.* at 38-45.) Turning to the question of Dr. Maddux's proposed trial testimony, the Appellate Division held that once the trial court had determined that the statements were not the subject of coercive interview techniques and were sufficiently reliable, it was within the trial court's purview to determine whether Dr. Maddux's testimony would be helpful to the jury in determining credibility, and that the trial judge had not abused his discretion in finding that the doctor's proposed testimony would not be helpful to the jury and had instead a capacity to cause undue confusion. (*Id.* at 46.)

The Appellate Division therefore affirmed Petitioner's conviction. Petitioner thereafter filed a petition for certification, which was denied by the New Jersey Supreme Court. (ECF No. 7-14.) Petitioner did not file a state collateral attack on his conviction, and instead filed his habeas petition following the denial of certification. (ECF No. 1.)

Dr. Maddux's report, which forms the center of Petitioner's current petition, contains two main sections – a several page long discussion of the general literature surrounding child sex abuse interviews and potential accuracy or fabrication risks in the abstract, followed by a brief discussion of the specific interviews at issue in Petitioner's case. (*See* ECF No. 7-11 at 110-16.) Dr. Maddux suggests that Transue "inject[ed] fantasy into the interview" by asking R.B. about her wings and whether she had a driver's license, all of which elicited responses suggesting the child understood the distinction between fantasy and reality, but in the same paragraph faults Transue for taking "no measures to account for the child's use of fantasy." (*Id.* at 113.) Maddux also suggested that in a few discrete instances, Transue asked questions the doctor felt were leading, largely in instances in which Transue was trying to get R.B. back on track or asking follow-up questions about statements R.B. had made during the interview. (*Id.* at 113-14.) The doctor also took fault with "16 option-posing utterances" by Transue related to Transue's efforts to focus on where Petitioner

touched or tickled R.B.; but the doctor "did not observe interviewer bias, incessant questioning, vilification of [Petitioner] or coercive questioning." (*Id.* at 114.)

Dr. Maddux reported that Woodfield did take measures to account for R.B.'s age, status, and use of fantasy, and did not present any incessant questioning, vilification of Petitioner, or coercive questioning. (*Id.*) The doctor did fault Woodfield, however, for using "suggestive utterances" and "leading statements." (*Id.*) Although the doctor suggests that some of Woodfield's questions suggested things beyond which R.B. had at that point stated, the specific instances the doctor highlights appear to be less suggestive of new facts than logical follow through – such as asking R.B. if "it leaves germs" after the child mentioned Petitioner's germs, or asking who told R.B. to keep the events secret when she told the detective that it had been a secret, which resulted in R.B. telling the detective it was R.B. herself who made that determination. (*Id.*) The doctor also faulted Woodfield for the use of directive questioning and option posing questions, and the use of props prior to R.B.'s description of what had occurred. (*Id.* at 115.)

In his conclusions, Dr. Maddux suggests that the questioning issues he observed could have increased the likelihood of false information being conveyed, and that the detectives use of props did not meet the doctor's view of best practices. (*Id.* at 115-16.) The doctor noted, however, that his classification of appropriate and inappropriate questioning was "subjective," admitted that a perfect interview is impossible, and that the use of leading or suggestive questions is sometimes necessary in certain circumstances. (*Id.* at 116.) The doctor thus was "unable to specifically comment upon [R.B.'s] accuracy as a result of Mr. Transue's and Det. Woodfield's interview practices" and could only say that some of the questioning techniques used may have elicited erroneous information if provided to some preschool aged children. (*Id.*)

13

## II. **LEGAL STANDARD**

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846-47 (3d Cir. 2013). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta[,]" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the]

applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### III. DISCUSSION

In his habeas petition, Petitioner contends that the exclusion of his proposed expert testimony regarding the suggestibility of the interrogation of R.B. Because "[t]he Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules," see *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6 (1983), claims challenging the admissibility of evidence are normally considered questions of state law which are not cognizable in habeas corpus. See *Keller v. Larkins*, 251 F.3d 408, 416 n. 2 (3d Cir. 2001) ("A federal habeas court . . . cannot decide whether the evidence in question was properly allowed under the state law of evidence"); see also *Estelle v. McGuire*, 502 U.S. 62, 67-70 (1991); *Wilson v. Vaughn*, 533 F.3d 208, 213-14 (3d Cir. 2008), *cert. denied*, 556 U.S. 1170 (2009). A habeas petitioner may therefore raise a habeas claim based on a state law evidentiary ruling only where he can show that the admission of the evidence at issue denied him Due Process under the Fourteenth Amendment by depriving him of the "fundamental elements of fairness in [his] criminal trial." *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014) (quoting *Riggins v. Nevada*, 504 U.S. 127, 149 (1992) (Thomas, J. dissenting)). "The Supreme Court has 'defined the category of infractions that violate 'fundamental fairness' very narrowly, based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.'" *Id.* (quoting *Medina v. California*, 505 U.S. 437, 443 (1992)). "In order to satisfy due process, [Petitioner's] trial must have been fair; it need not have been perfect." *Id.* (citing *United States v. Hasting*, 461 U.S. 499, 508 (1983)). Thus, a Due Process violation will only occur in the context of a state court evidentiary ruling when that ruling was "so arbitrary or

prejudicial that it rendered the trial fundamentally unfair." *Scott v. Bartkowski*, No. 11-3365, 2013 WL 4537651, at *9 (D.N.J. Aug. 27, 2013) (citing *Romano v. Oklahoma*, 512 U.S. 1, 12-13 (1994)).

The exclusion of the proposed expert testimony was not so arbitrary or prejudicial that it rendered Petitioner's trial fundamentally unfair. As the trial court noted, the doctor's report and proposed testimony took issue with portions of the questioning posed by Transue and Woodfield, but reached no ultimate conclusion as to the accuracy of R.B.'s statements or reports. The doctor could not say that R.B.'s statements were unreliable, only that in some instances similar questioning may have resulted in false reports. Even in taking issue with portions of the questioning, however, the doctor noted a lack of bias or coercive intent from Transue and Woodfield, and noted that the methodology used in the report was itself subjective. At times, the doctors report seems somewhat contradictory – faulting Transue for infusing fantasy into the conversation and not accounting for R.B.'s propensity for fantasy in the very questions Transue used to show that R.B. understood the difference between what was actually true and what was pretend. Ultimately, given the lack of any ability to actually opine on how reliable, accurate, or suspect R.B.'s statements actually were, and the fact that the trial court determined that the statements were admissible not withstanding the doctor's report, the trial court appears to have been largely correct in stating that the doctor's proposed testimony had a propensity to confuse and would not necessarily be helpful in the jury judging the reliability of R.B.'s statements. The trial court's decision to exclude that testimony was thus neither so arbitrary or prejudicial to deny Petitioner a fair trial, and the exclusion of that testimony was thus neither contrary to nor an unreasonable application of federal law.

Petitioner in his habeas petition attempts to reframe the exclusion of this testimony as the complete denial of a defense in his criminal proceedings. Although the Constitution "guarantees

16

criminal defendants a meaningful opportunity to present a complete defense," "state and federal rulemakers have broad latitude under the Constitution to establish" evidentiary rules, and "[o]nly rarely [has the Supreme Court] held that the right to present a complete defense was violate by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013). Such cases have largely involved rules that were irrational or indefensible. *Id.* Although Petitioner presents in his briefing a number of cases in which the Supreme Court or lower federal courts have found that the exclusion of certain evidence can amount to the deprivation of a right to present a complete defense, none of them are on point, and Petitioner has failed to provide any Supreme Court caselaw – and thus has failed to present any clearly established federal law for habeas purposes – squarely or by implication finding that the exclusion of expert testimony as to child abuse interview techniques amounts to the denial of the right to a complete offense in a situation analogous to this case. Petitioner has thus failed to show that the state court's determination on the admissibility of Dr. Maddux report was contrary to or an unreasonable application of state law, and therefore fails to establish a valid basis for habeas relief on that basis.

Even if Petitioner's claim were of greater legal merit, he would still not be entitled to relief in this matter as he has failed to show that the suppression of Dr. Maddux's proposed testimony had a substantial and injurious effect upon the outcome of his trial. Even error of a constitutional dimension will be considered harmless and not serve as a basis for relief in a habeas matter unless the petitioner can show that the error had a substantial and injurious effect upon the outcome of his trial. *Fry v. Pliler*, 551 U.S. 112, 115-16 (2007). In this matter, Dr. Maddux's report and proposed testimony took issue with various aspects of the interviews of Transue and Woodfield with R.B., but could not ultimately draw any conclusions on the reliability or accuracy of R.B.'s disclosures of the abuse suffered at Petitioner's hands. The doctor's report also did not even

17

attempt to discuss the interview or techniques used by Dr. Medina. While the doctor may have been able to provide Petitioner with a better and more scientific foundation for the contention that children sometimes make up or unintentionally fabricate stories, that concept is hardly foreign to the average juror, and the absence of the doctor's testimony did not prevent counsel from seeking to make that very point during cross examination and argument. That the jury did not find that to be the case here is unsurprising in a case where it was faced not only with the child's version of events, but Petitioner's own admissions to Detective Woodfield[2] which to some extent corroborated the child's claims that Petitioner had engaged in inappropriate physical and sexual contact with the child. In light of Petitioner's own admissions, the jury's ability to understand, interpret, and evaluate R.B.'s recorded statements and the testimony of the other witnesses, and Dr. Maddux's lack of an ability to form a conclusion on the reliability of R.B.'s reports, it is exceedingly unlikely that Dr. Maddux's proposed testimony would have in any way impacted the outcome of Petitioner's trial, especially in light of clear evidence that the jury carefully parsed and evaluated the statements of R.B. and Petitioner insomuch as they hung on the most severe count of the indictment. The decision to exclude the doctor's testimony thus did not have a substantial and injurious impact upon the jury's verdict, and that exclusion was therefore harmless and serves as no basis for habeas relief. Petitioner's habeas petition is therefore denied.

---

[2] In discussing prejudice, Petitioner attempts to bootstrap his *Miranda* claim back into this matter despite not having raised the *Miranda* issue as a claim of its own, arguing that the doctor's exclusion cannot be harmless in light of the fact that his own admissions were the product of Woodfield's interrogation techniques and cannot be used to show a lack of prejudice. Petitioner, however, has utterly failed to show that the decision to admit his statements to Woodfield was contrary to or an unreasonable application of federal law, nor could he do so in light of Petitioner's clear, knowing, and voluntary waiver of his *Miranda* rights. *See, e.g., Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010). As Petitioner's statements were clearly admissible, and the decision to admit them was not contrary to federal law, the Court can and does consider those statements in reaching its conclusion that the exclusion of the doctor's testimony was ultimately harmless for habeas purposes.

## IV. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "[A petitioner] satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude [that] the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because Petitioner's sole claim is clearly without merit for the reasons set forth above, he has failed to make a substantial showing of a denial of a constitutional right, and his petition is not adequate to receive encouragement to proceed further. This Court therefore denies Petitioner a certificate of appealability.

## V. CONCLUSION

In conclusion, Petitioner's habeas petition (ECF No. 1) is **DENIED**, Petitioner is **DENIED** a certificate of appealability, and the state's motion to seal (ECF No. 8) is **GRANTED**. An order consistent with this opinion shall be entered.

Hon. Karen M. Williams,
United States District Judge